**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHRISTOPHER B. WADE,

    Plaintiff,

    v.

    Civil Action No. 08-1187 (CKK)

DISTRICT OF COLUMBIA,

    Defendant.

**MEMORANDUM OPINION**
(April 20, 2011)[*]

    Plaintiff Christopher B. Wade, an officer in the District of Columbia Metropolitan Police Department, brings this action alleging a hostile work environment based on sex and retaliation by his employer in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Presently pending before the Court is Defendant's [31] Motion for Summary Judgment. Plaintiff has filed an opposition brief, and Defendant has filed a reply, and the motion is now ripe for adjudication. For the reasons explained below, the Court shall grant Defendant's motion with respect to Wade's hostile work environment claim and most of his retaliation claims and deny the motion with respect to one of Wade's retaliation claims.

## I. BACKGROUND

    Plaintiff Christopher B. Wade ("Wade") has been employed as a patrol officer with the Metropolitan Police Department ("MPD") since 2002. Def.'s Stmt.[1] ¶ 1. In May 2004, Wade

---

[*] The Court initially issued this Memorandum Opinion under seal on March 7, 2011. The Court now issues this public version with a few redactions and minor technical corrections.

[1] The Court strictly adheres to the text of Local Civil Rule 7(h) (formerly Rule 56.1) when resolving motions for summary judgment. *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir.

applied for and was assigned to the Office of Organizational Development ("OOD") as a

technical writer in the Directive Development Unit ("DDU") of the Policy and Program

Development Division ("PPDD"). *Id.* ¶ 2. During the period between October 2005 and October

2006, Wade worked under the direct supervision of Jo Hoots ("Hoots"), a civilian employee. *Id.*

¶ 3. From October 2005 until December 2006, Wade's second-line supervisor in that office was

Debra Hoffmaster ("Hoffmaster"), also a civilian employee.

According to Wade, things changed dramatically when Hoots and Hoffmaster came to

PPDD. *See* Decl. of Christopher Wade ("Wade Decl.") ¶ 6. At that time, Wade was one of four

men working in the PPDD. *See id.* The other three men were [REDACTED #1], [REDACTED

#2], and [REDACTED #3]. *Id.* ¶¶ 6-8. [REDACTED #1]'s working hours in the unit were from

5:30 A.M. to 2:00 P.M. Dep. of Christopher Wade ("Wade Dep.") at 24. Hoffmaster told

everyone in the unit that they would have to work from 8:30 A.M. to 5 P.M., and [REDACTED

#1] asked to leave the unit. *Id.* Then, [REDACTED #1] was replaced with a woman who was

allowed to work the same hours that [REDACTED #1] had worked. *Id.* at 25. Wade claims that

after [REDACTED #1] left, Hoots and Hoffmaster began to pick on [REDACTED #2]. Wade

Decl. ¶ 7. Hoots submitted a memorandum up the chain of command asking for [REDACTED

#2] to be transferred, but her request was denied because she could not demonstrate any problems

---

2002) (finding that district courts must invoke the local rule before applying it to the case). The
Court has advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes
facts identified by the moving party in its statement of material facts are admitted, unless such a
fact is controverted in the statement of genuine issues filed in opposition to the motion." [29]
Order at 2 (Jan. 25, 2010). Thus, in most instances the Court shall cite only to one party's
Statement of Material Facts ("Stmt.") unless a statement is contradicted by the opposing party, in
which case the Court may cite a party's Response to the Statement of Material Facts ("Resp.
Stmt."). The Court shall also cite directly to evidence in the record, where appropriate.

with his performance. *Id.* Wade claims that Hoots then began writing [REDACTED #2] up for

minor and non-existent infractions. *Id.* Around that time, [REDACTED #2] received notice that

he had made the list for promotion and requested a transfer until he received his promotion. *Id.*

[REDACTED #2] was replaced with a woman. *Id.* ¶ 9.

With [REDACTED #1] and [REDACTED #2] gone, the only men left in the unit were

Wade and [REDACTED #3]. According to [REDACTED #3], Hoffmaster subjected him to

supervision that was "very arbitrary, unprofessional, dictatorial and unnecessarily

micromanag[ing]." *See* Pl.'s Ex. 4 (MPD Office of Professional Responsibility Diversity and

EEO Compliance Unit Memorandum (Dec. 22, 2006)) (hereinafter, "MPD Investigation Report")

at 13.[2] [REDACTED #3]'s interactions with Hoffmaster caused him a lot of stress, and he was

eventually hospitalized because of a heart condition aggravated by job-related stress. *See id.* On

one occasion, [REDACTED #3] was told to write a report because he was late with a deadline.

*Id.* [REDACTED #3] also complained that Hoffmaster barraged him with demeaning emails

inquiring about his work. *Id.* at 13-14. [REDACTED #3] stated that he did not believe that the

females in the unit were subject to the same email traffic and monitoring as male members. *Id.* at

14. [REDACTED #3] also stated that he believed that [REDACTED #2] and [REDACTED #1]

were "pretty much forced out." *Id.* [REDACTED #3] stated that he also had confrontations with

---

[2] [REDACTED #3]'s statements are captured within an investigation report prepared by
MPD. In its reply brief, Defendant objects to the Court's consideration of this evidence on the
grounds that it would not be admissible at trial. However, the investigation report may be
admissible under the hearsay exception for public investigatory reports containing factual
findings, *see* Fed. R. Evid. 803(8)(C), and [REDACTED #3]'s statements contained therein are
likely admissible as admissions by a party-opponent because [REDACTED #3] gave the
statements during the scope of his employment with MPD, *see* Fed. R. Evid. 801(d)(2)(D).
Therefore, the Court shall consider this evidence as part of the record at summary judgment.

Hoots, whom he believed acted at Hoffmaster's direction. *Id.* After [REDACTED #3] filed a hostile work environment complaint, [REDACTED #3] was transferred out from under Hoffmaster's supervision in March 2006. *Id.* at 13-14.

Wade claims that after [REDACTED #3] was transferred, Hoots and Hoffmaster began trying to force him out of the unit. In mid-May 2006, Wade requested leave to attend a training seminar on writing skills. *See* Pl.'s Ex. 5, Att. 4. Hoots denied his request on the grounds that Wade had already attended a writing course and that she wanted another employee to attend instead. *See* Wade Decl. ¶ 10. According to Wade, however, he was the only one who had requested to attend the course, and the other employee sent by Hoots was an editor who should not have needed the training in question and had not requested to attend the course. *Id.* After Hoots denied his training request, Hoots met with Wade and told him that he was "living on the edge" because he handed in assignments on the day they were due. *Id.* ¶ 11. Hoots told Wade that if he did not feel comfortable in the unit that he could always request a transfer. *Id.* Wade felt that this meeting came from out of the blue and that he had not missed any deadlines. *Id.* Wade felt like Hoots was trying to attack his performance so that he could be transferred out of the unit. *Id.* ¶ 12.

In June 2006, Wade volunteered to assist with a youth initiative involving McGruff, the crime-fighting mascot. Pl.'s Stmt. ¶ 5. However, Wade later learned that the volunteering would require far more work than he had anticipated, and on July 12, 2006, he sent around an email saying he no longer wished to be involved. Wade Decl. ¶ 13. The following week, Hoffmaster told him that the assignment was mandatory. *Id.* Wade needed several days to put the presentation together, leaving him unable to complete his other work for several days. *Id.* ¶ 14.

In addition, Wade was scheduled to be out of the office for various reasons, including jury duty and testimony at a murder trial. *See* Pl.'s Ex. 5, Att. 7 at 1 (Emails between Wade and Hoots). When Wade was unable to complete two assignments by July 27, 2006, Hoots asked Wade to provide a written statement on a P.D. 119 form—which is typically used for taking statements from suspects—explaining why he was unable to meet the deadline. *Id.* at 2 (7/27/2006 Email from Hoots to Wade); MPD Investigation Report at 8. On August 14, 2006, Wade filled out a P.D. 119 form explaining that he had missed the deadline because: (1) Hoots told him to focus on the McGruff presentation and (2) he had been assaulted while working mandatory overtime on the weekend and was placed on sick leave up until the deadline. *See* Pl.'s Ex. 7 at 1. Wade submitted two additional statements on P.D. 119 forms on August 15, 2006. *See id.* at 2-3. Wade's coworkers reported that they did not know of any other employees in the unit who were required to submit explanations for missed deadlines on P.D. 119 forms. *See* MPD Investigation Report at 12-14, 22.

On August 1, 2006, Wade complained to the head of OOD, Senior Executive Director Sampson Annan, about the harassment he had been receiving from Hoots and Hoffmaster. Wade Dep. Tr. at 74-75. Annan told Wade there was nothing he could do about it but that Wade was free to file an equal employment opportunity ("EEO") complaint. *Id.* On August 15, 2006, Wade met with the director of MPD's EEO office to complain about what he perceived as discriminatory treatment from Hoots and Hoffmaster. *Id.* at 76-77. Wade brought more information about his treatment to the EEO office over time, and a formal complaint was filed on October 20, 2006. *Id.* at 78; MPD Investigation Report at 1. Wade argues that Hoots and Hoffmaster became aware of Wade's EEO activity by around October 5, 2006. *See* MPD

Investigation Report at 19; Pl.'s Opp'n at 12; Pl.'s Ex. 17 (Emails between Hoffmaster and Jacqueline Soares).

During August and September 2006, Wade was working on murder trials in court and was out of the office for an extended period, and the record reflects that Hoots and Hoffmaster were displeased with Wade's absence. One of Wade's coworkers overheard Hoots on the phone trying to find out "if it was OK for Wade to be gone" for such long periods and whether she could write him up for missing deadlines due to his duties in court. *See* MPD Investigation Report at 12. Several other coworkers reported that Hoots was trying to find a way to stop Wade from attending court. *Id.* at 13-14. One coworker opined that Hoots made unreasonable demands on Wade in light of his court duties, saying it was "almost like they wanted miracles." *Id.* at 14. The OOD Chief of Staff met with Hoots and told her that she could not punish Wade for performing his duties in court. *See id.* at 10-11. On September 6, 2006, Hoots sent Wade an email complaining about his absence from the office and his missed deadlines. *See* Pl.'s Ex. 5, Att. 5 (9/6/2006 Email from Hoots to Wade). In her email, Hoots stated that she thought Wade must be "exceedingly unhappy" in the unit and asked if he wanted her to request a transfer for him. *See id.* At some point during the murder trials, Wade asked Hoots for permission to reschedule a week of redeployment that would have allowed Wade to earn overtime compensation, but Hoots denied Wade's request. *See* Wade Dep. at 90-91.

On October 5, 2006, Hoots requested that Wade be transferred out of her unit due to missed deadlines associated with Wade's court duties. *See* Pl.'s Ex. 6 (Memorandum from Hoots to Michael J. Fitzgerald). Hoots requested that Wade be replaced with a female officer who had previously applied for a position in the unit. *Id.* The record shows that Wade had asked

several times between August and October 2006 to be transferred to another unit within OOD where he would not be under the supervision of Hoots and Hoffmaster. Def.'s Stmt. ¶ 10; Wade Dep. at 105.

In early October 2006, Hoots altered two of Wade's weekly activity reports, which record the number of hours worked, after Wade had signed them. *See* MPD Investigation Report at 6; Pl.'s Ex. 5, Att. 9 (Activity Reports). Hoots and Wade had a dispute about whether Wade had properly filled out the reports, and Wade was concerned about Hoots's corrections because Wade would be liable for any errors. *See* Pl.'s Ex. 8 (Emails between Wade and Hoots) at 1-5.

In late October 2006, Hoots and Hoffmaster approved Wade's fiscal year 2006 performance evaluation, giving Wade an overall rating of "Meets Expectations." *See* Pl.'s Ex. 9 (Officer Performance Rating Form) at 3-4. Wade appealed this ruling, and on March 25, 2007, an appeal panel granted Wade an increase to a rating of "Exceeds Expectations." *Id.* at 1-2. Wade contends that the rating assessed by Hoots was retaliatory. Hoots left the unit sometime in late October.

On November 9, 2006, Wade filed a formal charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") claiming sex discrimination and retaliation. Def.'s Stmt. ¶ 11; Def.'s Ex. 3 (11/9/2006 Charge of Discrimination). In that charge, Wade complained that Hoots and Hoffmaster had treated him differently than female technical writers. *See* Def.'s Ex. 3. Wade complained that in July 2006, Hoots had required him to perform duties outside his job description and given him unreasonable amounts of time to complete his duties. *See id.* Wade further stated that on August 1, 2006, he had complained about this discriminatory treatment to Senior Executive Director Sampson Annan and told him that he would be filing an

equal employment opportunity ("EEO") complaint. *Id.* Wade stated that Annan told Hoots about Wade's complaint and that Hoots then began to require him to provide written statements that female technical writers were not required to provide. *Id.* Wade further complained that on October 16, 2006, Hoots and Hoffmaster required that Wade report to them when he arrived at work and when he left each day and what he was doing throughout the day, and that female technical writers were not required to report in this manner. *Id.* Wade stated that he believed he had been discriminated against because of his sex and in retaliation for filing an internal EEO complaint. *Id.* Wade's charge indicated that the discrimination began on July 1, 2006 at the earliest, and he checked a box on the charge form indicating that the discrimination was a "continuing action." *See id.*

During the course of MPD's investigation into Wade's complaints of discrimination and retaliation, Hoffmaster made inquiries regarding Wade's use of time in the unit. *See* Pl.'s Ex. 17 (11/13/2006 File Memorandum). On November 30, 2006, Hoffmaster requested that Wade provide her with a "plan of action aka timeline/taskplan" for getting orders completed by an upcoming deadline. *See* Pl.'s Ex. 11 (11/30/2006 Email from Hoffmaster to Wade). Wade's coworkers told Wade they had not received a similar request. *See* Pl.'s Ex. 11 at 1-4.

On December 1, 2006, Hoffmaster told Wade that she wanted to meet with him and Denise Pearson, who had replaced Jo Hoots as Wade's direct supervisor, in her office later that afternoon. Wade Dep. at 109. The request came shortly after Hoots had come back to the unit to have a meeting with Hoffmaster. *Id.* Wade was unsure of whether to bring along a union representative to the meeting because, according to Wade, the presence of a union representative had upset Hoffmaster during a prior meeting. *Id.* at 110-11. Wade ultimately decided not to

bring a union representative because Pearson would be there as a witness. *Id.* at 111-12. According to Wade, when he came to her office for the meeting, Hoffmaster remained standing and commanded him to sit in a chair facing her desk instead of at the table where he would usually sit during meetings in Hoffmaster's office. *Id.* Hoffmaster purportedly told Wade that the meeting was set up for Wade to deliver his task/timeline plan. *Id.* at 112. Wade told Hoffmaster that he had already given her one, but she said it was not sufficient and started yelling and pointing at him. *Id.* When he looked to Pearson to see if she was observing Hoffmaster's behavior, Hoffmaster pointed at him and told him to look at her when was speaking to him. *Id.* Wade says that he told her he needed to get a union representative and started to leave, but Hoffmaster told him to sit down and not to leave her office. *Id.* at 112-13. Hoffmaster claims that Wade left her office without asking for permission or explaining that he wanted his union representative, although Pearson claims that Wade did say he was going to get a union representative. *See* MPD Investigation Report at 9, 16. Pearson reported that Hoffmaster "screamed" at Wade three times as he was leaving her office. *Id.* at 16. Hoffmaster admits that she raised her voice against Wade loud enough for someone outside her office to hear it. *Id.* at 9.

Wade returned to Hoffmaster's office with a union representative as well as another officer who worked in the OOD, Captain Ricky Mitchell. Wade Dep. at 114-15. According to Wade, Hoffmaster acted civilly when he returned to the meeting. *Id.* at 114. Hoffmaster asked Wade to confirm that he had left the meeting after she instructed him not to do so, which he did, and then the meeting ended. *Id.* at 114, 117. Wade was so humiliated by the meeting that he cried when he got back to his cubicle. *Id.* at 117. Wade testified that he felt intimidated by Hoffmaster because she held a position of authority over him. *Id.* at 117-18.

Following the meeting on December 1, 2006, Hoffmaster initiated a procedure to investigate and discipline Wade for failing to obey her order. *See* Pl.'s Ex. 12 (5/8/2007 Memorandum). Wade received an official reprimand on January 9, 2007, but this was later rescinded on appeal. *See id.* The official reprimand stated that a copy of the reprimand would be placed in Wade's personnel folder and would be considered in performance evaluations and used in deciding greater degrees of disciplinary action within a three-year period. *Id.* (1/9/2007 Official Reprimand). At some point after the meeting, Hoffmaster submitted a written request to have Wade transferred out of the DDU, citing Wade's failure to meet deadlines and his failure to obey her order. *See* Pl.'s Ex. 13. On December 4, 2006, the MPD EEO office recommended that Wade be detailed out of his position in the PPDD pending the outcome of the investigation relating to disobeying Hoffmaster's order. *See* Pl.'s Ex. 14 (12/4/2006 Memorandum to Executive Asst. to Chief of Police from Jacqueline Johnson). On December 12, 2006, Wade was detailed by the Assistant Chief of Police to the Sixth District Police Department. Def.'s Stmt. ¶ 16. Wade became permanently assigned to the Sixth District in April 2007. *Id.*; Pl.'s Ex. 17. Wade received an appointment to the police academy in June 2007. Def.'s Stmt. ¶ 20.

The MPD's EEO office completed its investigation into Wade's complaints and issued its final report on December 22, 2006. *See* MPD Investigation Report at 1. The investigation found insufficient evidence of a hostile work environment based on Wade's gender but found that there was reliable, credible evidence that Wade's supervisors had retaliated against him for engaging in protected EEO activity. *See id.* at 20.

On February 2, 2007, Wade filed a second charge of discrimination with the EEOC amending his earlier charge. *See* Def.'s Ex. 4 (2/2/2007 Charge of Discrimination). Wade

complained that on December 1, 2006 he was "intimidated, degraded, and felt threatened" by Hoffmaster. *Id.* Wade further complained about being detailed to the Sixth District on December 12, 2006. *Id.* Wade also complained about that the official reprimand he received on January 9, 2007 was in violation of MPD policy and the collective bargaining agreement. *Id.* Wade further complained that Hoffmaster had instructed one of Wade's co-workers to box up Wade's personal belongings, despite the fact that Wade is still assigned to the OOD office. *Id.* Wade stated that he believed he had been discriminated against based on his sex and in retaliation for both filing his internal EEO complaint and his formal charge with the EEOC. *Id.*

On February 12, 2007, the MPD EEO office wrote a letter to the EEOC responding to Wade's charges, describing briefly the nature of Wade's allegations and the outcome of the internal investigation. *See* Pl.'s Ex. 15 (2/12/2007 Letter from Jacqueline Johnson to EEOC).

## II. LEGAL STANDARD

Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials); or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to

properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Liberty Lobby, Inc.*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Id.* The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute. *See Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

## III. DISCUSSION

In his Amended Complaint, Wade claims that Defendant discriminated against him on the basis of his sex by creating a hostile work environment and retaliated against him for filing EEO complaints protesting this discrimination. Specifically, Wade claims that his supervisors created a hostile work environment by, *inter alia*, assigning him work beyond his job description, setting unrealistic work priorities, lowering his performance evaluation, denying him training opportunities afforded to his female colleagues, and treating him more harshly than his female coworkers regarding missed deadlines. *See generally* Am. Compl. ¶¶ 9-10, 13-14, 21, 23-24, 34-35. Wade also claims that his supervisors retaliated against him for reporting allegations of discrimination to MPD's EEO office by, *inter alia*, setting unrealistic work priorities, altering his weekly activity reports, refusing to conduct his performance evaluation and then giving him a poor evaluation, humiliating him during a meeting, and transferring him to the Sixth District. *See id.* ¶¶ 14, 17-21, 24, 26-27, 31-32. Wade claims that as a result of the alleged discrimination and retaliation, he suffered damage to his professional reputation and endured mental and physical pain and suffering, embarrassment, humiliation, and mental anguish. *See id.* ¶¶ 33, 36.

Defendant moves for summary judgment on Wade's claims, raising three arguments. First, Defendant contends that some of Wade's claims must be dismissed for failure to exhaust administrative remedies because they are not listed in the administrative charges that Wade filed with the EEOC. Second, Defendant claims that Wade has failed to establish that he suffered an adverse action as a result of the alleged retaliation or that such actions were causally connected to the retaliation. Third, Defendant argues that Wade has failed to establish that the allegedly discriminatory actions were severe or pervasive enough to constitute a hostile work environment.

The Court shall address the arguments below.

        *A.     Exhaustion of Administrative Remedies*

Defendant contends that Wade's hostile work environment claim and several of his discrimination claims are barred because he did not describe them in the charge of discrimination he filed with the EEOC. "Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge." *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995). Any civil action that follows a charge of discrimination "is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Id.* (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 479, 500 (7th Cir. 1994)); *see also Na'im v. Rice*, 577 F. Supp. 2d 361, 369-70, 372 (D.D.C. 2008). "At a minimum, the Title VII claims must arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Park*, 71 F.3d at 907. Defendant bears the burden of proving by a preponderance of the evidence that the plaintiff failed to exhaust administrative remedies. *Nai'm v. Rice*, 577 F. Supp. 2d at 370 (citing *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985)).

Defendant contends that Wade failed to exhaust his hostile work environment claim as well as his retaliation claims based on: (1) the altering of his weekly reports; (2) the failure to conduct his performance evaluation; (3) his receipt of a poor performance evaluation; and (4) the requirement that he complete a task/timeline plan. Wade argues that all of his retaliation claims are like or related to the claims stated in his formal charges and that the EEOC had an opportunity to address all of his claims administratively prior to the filing of this action.

1.    <u>Hostile Work Environment Claim</u>

Defendant argues that Wade's hostile work environment claim must be dismissed because Wade did not specifically claim the existence of a hostile work environment in his formal charges of discrimination filed with the EEOC.  Defendant relies primarily on the D.C. Circuit's decision in *Park v. Howard University*, in which the court held that the plaintiff had failed to exhaust her hostile work environment claim because her charge of discrimination alleged only that she was not selected for a promotion.  *See Park*, 71 F.3d at 907.  The court found that the plaintiff's allegations "did not express or even hint at a . . . hostile work environment claim."  *Id.*  By contrast, Wade's charges complained of multiple acts of discriminatory and/or retaliatory conduct and alleged that the actions were continuing in nature.  This Court has previously held that a hostile work environment claim that is based on the same conduct alleged in the EEOC charge has been exhausted.  *See Jones v. Billington*, 12 F. Supp. 2d 1, 7 (D.D.C. 1997); *accord Na'im v. Rice*, 557 F. Supp. 2d at 372 (quoting *Robertson v. Snow*, 404 F. Supp. 2d 79, 96 (D.D.C. 2005)) ("A plaintiff may adequately exhaust administrative remedies without specifically alleging a hostile work environment claim in [his] formal EEO complaint so long as the hostile work environment claim is 'like or reasonably related to the allegations . . . [in the formal EEO complaint] and grows out of such allegations.'").  Because Wade's hostile work environment claim is based primarily on the allegations he raised in his charges, the Court finds that he has exhausted his hostile work environment claim.

This finding is bolstered by the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  In *Morgan*, the Supreme Court explained that hostile work environment claims are different from discrimination or retaliation claims based on

discrete acts because they involve repeated conduct that occurs over a period of time and cannot be said to occur on any particular day. 536 U.S. at 115. Therefore, the Court held, a court determining whether a hostile work environment exists may look to conduct that occurred outside Title VII's limitations period, which is either 180 or 300 days before the charge is filed, *see* 42 U.S.C. § 2000e-5(e)(1). 536 U.S. at 116-17. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability." *Id.* at 117. Similarly, where a plaintiff files a charge of discrimination alleging a series of discriminatory acts that are logically related, the plaintiff may be said to have exhausted a claim for hostile work environment based on those acts.

### 2. Retaliation Claims

Defendant also contends that any retaliation claims based on discrete acts not enumerated in Wade's administrative charges must be dismissed for lack of exhaustion. Specifically, Defendant seeks to dismiss any claims based on: (1) the alteration of Wade's weekly reports; (2) the failure to conduct Wade's performance evaluation; (3) Wade's receipt of a poor performance evaluation; and (4) the requirement that Wade complete a task/timeline plan. Wade contends that these claims have been exhausted because they are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Park*, 71 F.3d at 907. Additionally, Wade contends that the record shows that the EEOC was actually informed about these incidents during its investigation, and therefore the claims arise from "the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Id.*

As the D.C. Circuit explained in *Park*, "[t]he administrative charge requirement serves

the important purposes of giving the charged party notice of the claim and 'narrow[ing] the issues for prompt adjudication and decision." 71 F.3d at 907 (quoting *Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 472 n.325 (D.C. Cir. 1976). "[A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge." *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (quoting *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir. 1989). "Naturally every detail of the eventual complaint need not be presaged in the EEOC filing, but the substance of . . . a Title VII claim[] must fall within the scope of 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Id.* (quoting *Park*, 71 F.3d at 907).

In *Marshall v. Federal Express Corp.*, the court held that an employee who complained in her administrative charge that her employer denied her an opportunity to apply for a promotion did not exhaust her claim for wrongful termination, explaining that "[t]he [Equal Employment Opportunity] Commission could not reasonably be expected to investigate Marshall's firing based on the allegations in the charge, which spoke only of Federal Express's failure to allow her to apply for the Operations Agent job." 130 F.3d at 1098. Similarly, in *Hudson v. Children's National Medical Center*, 645 F. Supp. 2d 1 (D.D.C. 2009), the court held that the plaintiff had failed to his exhaust his administrative remedies with respect to claims for constructive discharge and hostile work environment because the allegations in his charge focused solely on his employer's failure to select him for a promotion. *Id.* at 5-6. The import of *Park*, *Marshall*, and *Hudson* is that where the plaintiff's administrative charge alleges only a single act of

discrimination, the plaintiff has failed to exhaust claims that rely on other acts not alleged in the charge.

In other cases, however, courts have held that a plaintiff exhausted claims not specified in the charge where it was clear that the EEOC would be aware of those claims during the course of investigating the charge. For example, in *Test v. Holder*, 614 F. Supp. 2d 73 (D.D.C. 2009), the court held that the plaintiff had exhausted certain retaliation claims by presenting them to the EEOC during the course of its investigation into separate but related claims. *See id.* at 83. In *Lane v. Tschetter*, Civil Action No. 05-1414, 2007 WL 2007493 (D.D.C. July 10, 2007), the court held that an employee had exhausted a claim that her employer suspended her indefinitely without pay by alleging in her administrative charge that the employer had terminated her on the same date pending review by a grievance board. *Id.* at *5. The Court reasoned that the indefinite suspension claim "was a foreseeable and logical consequence" of the decision to terminate, and therefore it "would be reasonably expected to surface during an investigation of her EEO charge." *Id.* In *Wiley v. Glassman*, 511 F.3d 151 (D.C. Cir. 2007), the D.C. Circuit held that the district court erred by dismissing an employee's retaliation claim on the basis that it was not specifically listed in her formal administrative complaint. *Id.* at 160. The court ruled that the employee's allegation that her employer had reduced the amount of broadcast airtime she was responsible for producing reasonably grew out of her other allegations that her employer had denied her career advancement and promotional opportunities. *Id.*

In this case, Wade's administrative charges filed with the EEOC identified a series of allegedly discriminatory and retaliatory events over a time period that included the four actions that Defendant claims were not exhausted, i.e., altering weekly activity reports, failing to conduct

a performance evaluation, delivering a negative performance evaluation, and requiring Wade to complete a task/timeline plan.  Wade argues that these claims were properly exhausted because they were investigated by the MPD's EEO office, and it is reasonable to assume that the EEOC's investigation would uncover the full panoply of allegations raised by Wade during MPD's internal investigation.  The record shows that MPD sent a letter to the EEOC in response to the charges indicating that Wade had complained about a hostile work environment and retaliation, citing examples including the denial of training opportunities, delayed receipt of Wade's 2006 performance evaluation, and complaints about Wade's court obligations.  The record also shows that MPD's investigation report explicitly addressed Wade's complaints about his performance evaluation, the requirement that he complete task/timeline reports, and the alterations to his weekly activity reports.  Therefore, the EEOC should have been aware of and reviewed these claims when it investigated Wade's charges.  Accordingly, these claims "arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination," *Park*, 71 F.3d at 907, and therefore the Court finds that Defendant has not met its burden of demonstrating that the claims were not exhausted.

The Court does recognize that several courts in this district have suggested that the "like or reasonably to" standard elicited in *Park* no longer applies in light of the Supreme Court's holding in *National Passenger Rail Corp. v. Morgan* that each discrete adverse employment action individually triggers Title VII's limitation period on filing claims.  *See Romero-Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 148-50 (D.D.C. 2005); *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 137-38 (D.D.C. 2004) ("Unfortunately for the plaintiff, *Park* no longer reflects the state of the law.").  These courts held that *Morgan* requires a plaintiff to file a new administrative

charge to complain about retaliation that stems from the filing of the initial charge because subsequent retaliation is a discrete employment action. *But see Velikonja v. Mueller*, 315 F. Supp. 2d 66, 74-75 (D.D.C. 2004) ("[W]here the ends of administrative exhaustion have been served by the pursuit of administrative remedies with regard to the subsequent acts, separate initiation of administrative exhaustion for related post-complaint conduct is not required."), *aff'd in part, rev'd in part on other grounds*, 466 F.3d 122 (D.C. Cir. 2006). The D.C. Circuit has not yet addressed this issue. *See Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010). However, this case does not involve actions that occurred outside the time period described in the administrative charges, and therefore the temporal concerns raised by *Morgan* do not come into play. Therefore, the Court finds that *Park* is still controlling on the issue before the Court, *viz.* whether Wade adequately presented his claims to the EEOC for investigation. Applying that standard, the Court finds that all of Wade's claims are "like or reasonably related to the allegations of the charge and growing out of such allegations." 71 F.3d at 907.

B.      *Wade's Retaliation Claims*

Title VII makes it unlawful for an employer to "discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII claims are assessed pursuant to a burden-shifting framework initially set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). As the D.C. Circuit has explained:

Under that framework, a plaintiff must first establish a prima facie case of retaliation

by showing (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two.  If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions.  If the employer does so, the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all of the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation.

*Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (citations and quotations omitted).  A "materially adverse action" is an action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  There is no dispute that Wade engaged in statutorily protected activity by complaining about alleged discrimination to the MPD's EEO office or to the EEOC.  However, Defendant contends that Wade cannot establish the other elements of a prima facie case of retaliation.

Wade contends that there are eight alleged retaliatory actions that were materially adverse to him: (1) denying him overtime; (2) forcing him to complete three P.D. 119 forms for a late assignment; (3) giving him a poor performance rating; (4) altering his weekly activity reports; (5) tracking his whereabouts by calling other departments to confirm his presence; (6) yelling and screaming at Wade during the December 1, 2006 meeting; (7) issuing an official reprimand for disobedience; and (8) involuntarily transferring him to the Sixth District.  *See* Pl.'s Opp'n at 33-34.  The record shows that the first two actions occurred before Wade's supervisors became aware of his EEO activity; therefore, they cannot form the basis of any retaliation claim.  The Court also notes that Wade has failed to provide the Court with evidence supporting his claim regarding the denial of overtime.

Wade's next claim is that Hoots and Hoffmaster retaliated against him by giving him an artificially low rating on his October 2006 performance evaluation. "In order for a performance evaluation to be materially adverse, it must affect the employee's 'position, grade level, salary, or promotion opportunities.'" *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008)). Although Wade has provided evidence that his performance rating was lower than what was appropriate, he has not provided any evidence demonstrating that a lower rating would have affected any of the terms of his employment. Furthermore, the rating was reversed on appeal approximately five months later, resulting in a more favorable evaluation. Accordingly, Wade has failed to establish that his poor performance rating constitutes actionable retaliation. *See id.* ("[Plaintiff's] bare, conclusory allegation that she was denied promotional and bonus opportunities [as a result of Defendant's retaliatory actions] does not discharge her burden to show the evaluations were 'attached to financial harms.") (quoting *Baloch*, 550 F.3d at 1199).

Wade's fourth claim is that Hoots retaliated against him by altering his weekly activity reports. However, Wade does not argue that the alterations caused him any actual harm, and the record shows, at best, that Wade and Hoots had a disagreement about how Wade should be reporting his time. Disagreements with a supervisor are part of the ordinary tribulations of the workplace. *See Burlington*, 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."). Similarly, Wade's fifth claim—that his supervisors were overly aggressive in tracking his whereabouts to ensure that he was not avoiding his duties—involves a common aspect of the working environment, and Wade has not

explained how this caused him any harm.  *See id.* at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."). Therefore, no reasonable jury could conclude that the altering of weekly activity reports or the efforts taken by Hoots and Hoffmaster to track Wade's whereabouts constitute materially adverse actions.

Wade's sixth claim relates to the December 1, 2006 meeting during which Wade claims he was demeaned by Hoffmaster and humiliated in front of his coworkers.  Defendant argues that "loss of reputation or prestige are not injuries that constitute 'adverse actions' for purposes of a Title VII retaliation claim."  *See* Def.'s Reply at 7 (quoting *Jordan v. Evans*, 355 F. Supp. 2d 72 (D.D.C. 2004); *see also Stewart v. Evans*, 275 F.3d 1126, 11136 (D.C. Cir. 2002) ("[P]ublic humiliation or loss of reputation does not constitute an adverse employment action under Title VII.").  However, the authority cited by Defendant predates the Supreme Court's decision in *Burlington Northern*, which clarified that the scope of Title VII's antiretaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment."  548 U.S. at 64.  The Supreme Court "phrase[d] the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters."  *Id.* at 69.  Furthermore, "[c]ourts cannot examine whether any isolated action, on its own, qualifies as 'adverse.'  Instead, courts must consider whether 'based upon the *combined effect* of . . . alleged events, a reasonable worker could be dissuaded from engaging in protected activity.'"  *Test v. Holder*, 614 F. Supp. 2d at 84; *see also Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010) (considering plaintiff's proffered retaliatory actions both alone and in combination to determine whether they were materially adverse).  In *Test*, the court found that

the plaintiff had asserted a materially adverse action based on the employer's scheduling meetings at which the plaintiff could not attend, verbally assaulting him, undermining his authority and reducing his workload, locking him out of the building, issuing him an unfavorable performance evaluation, denying him a performance award, and refusing to discuss an individual development plan with him. 614 F. Supp. 2d at 83-84.

Construing the record most favorably to Wade, the Court finds that the conduct of Hoffmaster during the December 1, 2006 meeting—yelling at Wade for insubordination and criticizing his inability to meet deadlines in front of other employees—could be construed by a reasonable jury as a materially adverse action, especially when considered in conjunction with the prior pattern of harassing conduct by Hoffmaster and Hoots. *Cf. Mogenhan*, 613 F.3d at 1166 (finding materially adverse action where plaintiff's supervisors branded her as a troublemaker by publicizing her EEO complaint to other employees in the office). Although employees must tolerate some amount of unprofessionalism from their supervisors, *see Baloch*, 550 F.3d at 1199 (finding that supervisor's "profanity-laden yelling" did not amount to adverse action), reasonable employees might be dissuaded from complaining about discrimination if they knew that doing so would subject them to continued harsh treatment from their supervisors and humiliation in front of their peers. Wade has established a causal connection to his protected activity because the allegedly retaliatory acts occurred shortly after his supervisors learned about Wade's EEO complaint and the MPD's investigation. Accordingly, the Court shall deny Defendant's motion for summary judgment with respect to this claim.

Wade's seventh alleged adverse action is the reprimand issued to him for disobedience, which was later rescinded on appeal. As with a negative performance evaluation, however, a

reprimand is generally not actionable as retaliation unless there is some evidence that it caused material harm to the employee. *See Baloch*, 550 F.3d at 1199. As this Court recently noted, "mere speculation that a letter of reprimand *may* lead to future punishment is insufficient to establish an adverse employment action." *Herbert v. Architect of the Capitol*, Civil Action No. 07-1516, 2011 WL 637549, at *12 (D.D.C. Feb. 23, 2011) (citation omitted). The fact that the reprimand was rescinded generally precludes a claim that the reprimand was materially adverse. *See Na'im*, 626 F. Supp. 2d at 78 (holding that reprimand did not constitute materially adverse action because it was rescinded). Therefore, the Court finds that the reprimand cannot constitute a materially adverse action.

Wade's final claim is that his transfer to the Sixth District was retaliatory. It is unclear from the record whether Wade was transferred because of his own request to be transferred out from under the supervision of Hoots and Hoffmaster, the requests submitted by Hoots and Hoffmaster, or the request submitted by the MPD's EEO office. However, construing the record most favorably to Wade, the Court infers that his transfer may have been retaliatory. "Lateral transfers—those entailing no diminution in pay and benefits—qualify as adverse employment actions if they result in materially adverse consequences affecting the terms, conditions, or privileges of the plaintiff's employment." *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010) (quotation marks and citations omitted). Therefore, a jury may find that a lateral transfer is actionable retaliation if the new position involves significantly diminished responsibilities. *Id.* In this case, however, Wade has provided no evidence from which a jury could conclude that his transfer to the Sixth District affected the terms, conditions, or privileges of his employment. Wade does discuss the difference between his job as a technical writer and

his assignment to the Sixth District as a patrol officer in his opposition brief, but he does not support this argument with citation to any evidence in the record. Therefore, Wade has failed to support his claim that the transfer to the Sixth District constituted a materially adverse action. Accordingly, the Court shall grant Defendant's motion for summary judgment on this claim.

As explained above, the Court finds that Wade has established a prima facie case of retaliation relating to his mistreatment during the December 1, 2006 meeting with Hoffmaster. Defendant has not advanced a legitimate nonretaliatory reason for Hoffmaster's actions during this meeting, and therefore Wade's prima facie case is sufficient evidence for a jury to make a finding of retaliation. Accordingly, the Court shall deny Defendant's motion for summary judgment with respect to this claim. However, Wade has failed to establish a prima facie case of retaliation with respect to the other actions he claims to be retaliatory because they either occurred before his supervisors could have been aware of his protected activity or do not constitute materially adverse actions. Therefore, the Court shall grant Defendant's motion for summary judgment with respect to Wade's remaining retaliation claims.

C.      *Wade's Hostile Work Environment Claim*

Title VII makes it unlawful for an employer to "requir[e] people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993). "To establish a prima facie hostile work environment claim, a plaintiff must demonstrate (1) that he is a member of a protected class, (2) that he was subject to unwelcome harassment, (3) that the harassment occurred because of his race or gender, (4) that he was subject to unwelcome harassment, (4) that the harassment affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known of the harassment, and failed to act to prevent

it." *Hunter v. D.C. Child & Family Servs. Agency*, 710 F. Supp. 2d 152, 157-58 (D.D.C. 2010).

A hostile work environment is actionable under Title VII "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21 (citations omitted) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). In determining whether a work environment is hostile or abusive, courts must look at all the circumstances, including the frequency and severity of the discriminatory conduct, whether the conduct is physically threatening or humiliating as opposed to merely offensive, and whether there is unreasonable interference with an employee's work performance. *Id.* at 23. In order to be actionable under the statute, a work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

Defendant argues that Wade's hostile work environment claim must be dismissed because Wade has failed to establish that he suffered harassment that was sufficiently severe or pervasive to alter the conditions of his employment. The Court agrees. "To prevail on . . . a claim [for hostile work environment], a plaintiff must show that the employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris*, 510 U.S. at 21). With the exception of the December

1, 2006 meeting, Wade has not alleged any incidents of intimidation, ridicule, or insult occurring

in the workplace. Rather, Wade's hostile work environment claim is essentially an

amalgamation of disparate treatment claims. Courts have been reluctant to transform such

allegations into a cause of action for hostile work environment. *See Lester v. Natsios*, 290 F.

Supp. 2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims

. . . are different in kind from a hostile work environment claim that must be based on severe and

pervasive discriminatory intimidation or insult."). Although incidents of disparate treatment can

establish a hostile work environment if connected in pervasive pattern of severe harassment, *see*

*Faragher*, 524 U.S. at 788, the actions Wade complains about do not rise to this level.

Wade concedes that neither Hoots nor Hoffmaster made derogatory comments about men

or engaged in physical or sexual actions targeted toward the men in the office. *See* Pl.'s Opp'n at

24-25. Rather, Wade contends that his supervisors created a hostile work environment by

attempting to manufacture performance issues for male employees to force them to leave the

unit. However, courts have generally rejected hostile work environment claims that are based on

work-related actions by supervisors. *See, e.g.*, *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94

(D.D.C. 2009) ("[T]he removal of important assignments, lowered performance evaluations, and

close scrutiny of assignments by management [cannot] be characterized as sufficiently

intimidating or offensive in an ordinary workplace context."); *Bell v. Gonzales*, 398 F. Supp. 2d

78, 92 (D.D.C. 2005) (finding that actions such as exclusion from the informal chain of

command, close monitoring of work, missed opportunities for teaching, travel, and high-profile

assignments, and reassignment to another unit did not amount to a hostile work environment

because "they cannot fairly be labeled abusive or offensive"); *see also Houston v. SecTek, Inc.*,

680 F. Supp. 2d 215, 225 (D.D.C. 2010) ("Allegations of undesirable job assignment or modified job functions and of [supervisor's] unprofessional and offensive treatment are not sufficient to establish that [plaintiff's] work environment was permeated with discriminatory intimidation, ridicule, and insult.") (citation and quotation marks omitted). Under the circumstances, the actions taken by Hoots and Hoffmaster were not objectively offensive.

Moreover, there is little evidence that the actions of Hoots and Hoffmaster unreasonably interfered with Wade's work performance. Although some additional time would have been required to fill out the P.D. 119 forms and task/timeline plans required by Hoots and Hoffmaster, the other actions supporting Wade's hostile work environment claim—the denial of a training opportunity, altering weekly activity reports, lowering his performance evaluation, and calling other departments to determine his location—would not have significantly affected Wade's performance on the job. This is particularly true in light of the frequency with which Wade was out of the office, which limited his contact with his supervisors. Although Wade was no doubt annoyed and insulted by the actions of Hoots and Hoffmaster, they cannot fairly be characterized as abusive or hostile, and there is no evidence that he was physically threatened by their actions.

Therefore, the Court finds that no reasonable jury could conclude that Wade's workplace was permeated with discriminatory conduct that was sufficiently severe to alter the terms and conditions of Wade's employment. Accordingly, the Court shall grant Defendant's motion for summary judgment with respect to Wade's hostile work environment claim.

## IV. CONCLUSION

For the reasons explained above, the Court finds that Wade has failed to establish the existence of a hostile work environment and failed to establish a prima facie case of retaliation

except with respect to the alleged retaliatory actions taken by Defendant during a December 1, 2006 meeting.  Accordingly, the Court shall GRANT-IN-PART and DENY-IN-PART Defendant's [31] Motion for Summary Judgment.  An appropriate Order accompanies this Memorandum Opinion.

                                        _____/s/_____
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge